UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

JAYLEN CUBA,

Defendant.
______________________________/

Case No. 4:26-cr-20264

F. Kay Behm
United States District Judge

ORDER DENYING DEFENDANT'S
MOTIONS TO SUPPRESS (ECF Nos. 18, 19)

## I. PROCEDURAL HISTORY

On May 6, 2026, Defendant Jaylen Cuba was indicted on one count of illegal possession of a machinegun in violation of 18 U.S.C. § 922(o). (ECF No. 10). On August 10, 2026, Defendant filed two motions to suppress, one for the suppression of all evidence obtained due to an illegal seizure and warrantless search (ECF No. 18), and another for the suppression of statements obtained in violation of Miranda (ECF No. 19). The government has filed responses in opposition to both motions. (ECF Nos. 20, 21). An evidentiary hearing was held on October 22, 2026, at which Michigan State

Troopers Cody Lukas and Brandon Maples testified. For the reasons set forth below, Defendant's motions will be DENIED.

## II. FACTUAL BACKGROUND

On April 22, 2026, Troopers Maples and Lukas were traveling southbound on Martin Luther King Avenue in Flint, Michigan, when they observed a car travel from the left lane to the right without signaling. The car then turned right onto Genesee Street, at which time both troopers observed that the vehicle's windows were illegally tinted. The car then turned into the driveway of a residence on Genesee Street without using a signal. At that point, the troopers initiated a traffic stop.

As the troopers got out of their vehicle, Trooper Lukas observed Cuba, in the driver's seat, reach down toward the floorboard of his car. (Exhibit 3, Lukas Bodycam, at 0:49-0:50). Trooper Maples approached Cuba's window, asked Cuba for his driver's license, and advised Cuba that the reasons for the stop were the illegal window tint and the failure to signal when changing lanes. (Exhibit 4, Maples Bodycam, at 0:50-1:02). Shortly after Trooper Maples approached Cuba's window, he observed a black pistol on the floorboard near Cuba's feet. Trooper Maples signaled to Trooper Lukas over the roof of Cuba's car that he saw a gun by making a pistol gesture with his

hand. (Exhibit 1, Outward Dashcam, at 1:40-1:47). Trooper Maples also observed a burnt marijuana cigarette on Cuba's lap. From the front passenger window, Trooper Lukas noticed the burnt marijuana cigarette and an open, half-full bottle of Patron tequila on Cuba's front passenger seat.

Trooper Maples then asked Cuba to step out of the vehicle while he searched Cuba's information, at which time he asked Cuba to face forward and put his hands behind his back. (Exhibit 4, Maples Bodycam, at 1:09-1:30). When Cuba expressed that he was confused as to why he was being taken out of the car, Trooper Lukas responded that he had an open bottle, and Trooper Maples indicated that he saw "some weed." (Id., at 1:30-1:38). As Trooper Lukas came around the front of the car to assist Trooper Maples, he can be heard saying "52, 52," which is code for a concealed weapon, to indicate to Trooper Maples that he saw a firearm on the driver's side floorboard. (Exhibit 3, Lukas Bodycam, at 1:36-1:39). When Cuba resisted the handcuffs, Trooper Maples executed a takedown maneuver and after some struggling, the troopers were able to place Cuba in handcuffs. (Exhibit 1, Outward Dashcam, at 2:00-3:55).

After Cuba was placed in the backseat of Trooper Maples' patrol car in handcuffs, Trooper Maples, seated in the driver's seat, began discussing the

stop with Cuba, who responded normally. (Exhibit 2, Inward Dashcam, at 17:22-17:50). Trooper Maples then read Cuba his Miranda rights from his department issued Miranda rights card. (Id., at 17:50-18:09). After he finished reading them, the following exchange occurred:

Maples: Do you understand those rights…that I read to you?

Cuba: [no response]

Maples: Do you understand them?

Cuba: [no response]

Maples: Can you hear me?

Cuba: [unintelligible]

Maples: I want to talk to you about what's going on because it could probably help you.

Cuba: [unintelligible]

Maples: You don't want to talk?

Cuba: There's nothing to talk about.

Maples: I just want to talk about what happened.

Cuba: Ain't shit happen.

Maples: Well, you got a gun under the seat.

Cuba: It's Flint.

(Id., at 18:09-18:37).

Meanwhile, Trooper Lukas conducted a search of the vehicle, seizing a black, Glock, Model 19 Gen 5 9mm caliber pistol from the driver's side floorboard, which was loaded with a round in the chamber and a 31-round magazine containing 30 rounds. (ECF No. 20, PageID.79; see Exhibit 5, Photograph of Seized Evidence). A red Glock switch was attached to the pistol. (ECF No. 20, PageID.79). Next to the pistol, Trooper Lukas also found and seized an additional 24-round magazine containing 24 rounds and a 15-round magazine containing seven rounds. (Id.).

In the driver's side door compartment, Trooper Lukas found and seized a pill bottle labeled "Oxycodone/Hydrocholoride," which did not have a prescription label and contained 36 Oxycodone pills, 60 Oxycontin pills, and 33 amphetamine pills. (Id., PageID.80). In the same compartment, Trooper Lukas found an orange bottle half-full of suspected Promethazine (known as "lean" or "purple drank"). (Id.). He also found a 9mm bullet in the vehicle's center cupholder and an unsealed bottle of Patron tequila with liquid still inside on the front passenger seat. (Id.). In the trunk, Trooper Lukas found and seized twelve unopened bottles of Promethazine, two half-full bottles of suspected Promethazine, and one 9mm bullet. (Id., PageID.81). The troopers

compiled this evidence on the hood of Cuba's car and photographed it. (Exhibit 5, Photograph of Seized Evidence).

## III. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. Amend. IV. An ordinary traffic stop by the police is considered a "seizure" within the meaning of the Fourth Amendment. United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008); see also Arizona v. Johnson, 555 U.S. 323, 330 (2007); Brendlin v. California, 551 U.S. 249, 255-56 (2007) (holding that once a car is stopped, its occupants have been seized). Accordingly, "any evidence seized during an illegal traffic stop must be suppressed as 'fruits of the poisonous tree.'" United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999) (quoting Wong Sun v. United States, 371 U.S. 471, 484 (1963)).

IV.

ANAL

YSIS

A. Motion to Suppress All Evidence Obtained Due to an Illegal Seizure and Warrantless Search (ECF No. 18)

Cuba argues that his arrest and the subsequent search of his vehicle were unlawful because the firearm was not in plain view and an individual cannot be placed under arrest and a warrantless search conducted based on a civil infraction. (ECF No. 18). The government argues that although the civil infraction provided justification for the traffic stop, the firearm established reasonable suspicion to detain Cuba, and the firearm, the burnt marijuana cigarette in Cuba's lap, and the open bottle of alcohol provided probable cause to search the vehicle. (ECF No. 20).

"A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred." United States v. Blair, 524 F.3d 740, 748 (6th Cir. 2008) (citation omitted). A police officer may also, as a matter of course, order the occupants of a lawfully stopped automobile to get out of their car. See Pennsylvania v. Mimms, 434 U.S. 106, 110-11 (1977); Maryland v. Wilson, 519 U.S. 408, 415 (1997). Although Cuba challenged the basis for the traffic stop at the hearing, both troopers testified that they saw

him change lanes without signaling and that they observed illegal window tint on the car's front side windows, which justified a traffic stop.

Cuba also argues that he was illegally placed under arrest and his vehicle searched without probable cause. "An officer can stop and briefly detain a person when the officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity." United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010) (citations omitted). Reasonable suspicion requires "only 'a moderate chance of finding evidence of wrongdoing,'" United States v. Hilton, 625 F. App'x 754, 758 (6th Cir. 2015) (quoting Safford Unified Sch. Dist. No. 1 v. Redding, 557 U.S. 364, 371 (2009)), which is "more than just a 'mere hunch,' but is satisfied by a likelihood of criminal activity less than probable cause, and 'falls considerably short of satisfying a preponderance of the evidence standard.'" Smoak v. Hall, 460 F.3d 768, 778 (6th Cir. 2006) (quoting United States v. Arvizu, 534 U.S. 266, 274 (2002)). To determine whether reasonable suspicion existed, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." United States v. Galaviz, 645 F.3d 347, 353 (6th Cir. 2011) (quoting Arvizu, 534 U.S. at 273).

Here, the troopers had reasonable suspicion to detain Cuba upon seeing the firearm in the vehicle. "In Michigan, it is a crime to carry a pistol in a vehicle without a firearm license." Galaviz, 645 F.3d at 356 (citing Mich. Comp. Laws § 750.227). An individual carries the burden of establishing that he has a license to carry the firearm. Mich. Comp. Laws. § 776.20. "As a result of this statutory structure, merely showing that a defendant carried a pistol in a vehicle he owns or operates establishes a prima facie violation of state law; at that point, it is up to the defendant to raise the issue of licensure and offer proof that his possession was lawful." United States v. Williams, 483 F. App'x 21, 27 (6th Cir. 2012) (citing People v. Henderson, 218 N.W.2d 2, 4 (Mich. 1974)). Therefore, when both troopers observed a firearm in plain view on the floorboard of Cuba's car, and Cuba did not indicate that his possession of the firearm was lawful, troopers had valid, reasonable suspicion to detain Cuba. Further, "the use of handcuffs [does not] exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution." Houston v. Clark Cnty. Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1999).

Next, although a warrant is typically required before officers perform a search, "officers may search an automobile without having obtained a

warrant so long as they have probable cause to do so." Collins v. Virginia, 584 U.S. 586, 592 (2018); see also United States v. Peake-Wright, 126 F.4th 432, 438 (6th Cir. 2025) ("The automobile exception permits officers to search a vehicle without a warrant if they 'have probable cause to believe that the vehicle contains evidence of a crime.'" (citation omitted)). Probable cause is "not a difficult standard to meet." United States v. Whitlow, 134 F.4th 914, 919 (6th Cir. 2025). It only requires a "fair probability" that an officer will find contraband or evidence of a crime. United States v. Sanders, 106 F.4th 455, 461 (6th Cir. 2024) (en banc) (citation omitted). A probable-cause determination is made based on the totality of the circumstances, which "includes a realistic assessment of the situation from a law enforcement officer's perspective." United States v. Ferguson, 8 F.3d 385, 392 (6th Cir. 1993). "Just as 'any amount of illegal contraband' can establish probable cause 'to seize it,' so too can any amount of illegal contraband establish probable cause to conduct a warrantless search of a vehicle." United States v. Whitlow, 134 F.4th at 922 (quoting United States v. Sheckles, 996 F.3d 330, 341 (6th Cir. 2021)).

Just as the view of the firearm established reasonable suspicion to detain Cuba, so too did it establish probable cause to search his vehicle

under the automobile exception. See Galaviz, 645 F.3d at 357 ("The automobile exception allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime. Here, that probable cause was supplied when officers viewed the gun in the car, which constitutes a violation of Mich. Comp. Laws § 750.227." (citation omitted)). Further, the troopers also observed a burnt marijuana cigarette on Cuba's lap and an open bottle of alcohol in the front passenger seat, either of which could have independently provided probable cause to search the car. See United States v. Hollin, 459 F. App'x 535, 540 (6th Cir. 2012) ("The discovery of the marijuana roaches in plain view provided a basis to believe there was probable cause to search the Apartment."); see also United States v. Stevenson, 43 F.4th 641, 648 (6th Cir. 2022) ("So the smell of marijuana, Stevenson's admission [that there was marijuana in the car], or the discovery of marijuana, itself—pick any—gave [the officer] probable cause to continue searching the entire car for marijuana, including the glove compartment."); United States v. Howton, 260 F. App'x 813, 817 (6th Cir. 2008) (finding that troopers had probable cause to search a vehicle where there was an open container of alcohol in violation of state law). Troopers were therefore

justified in detaining Cuba and searching his car. For this reason, his first motion to compel is denied.

B. Motion to Suppress Statements Obtained in Violation of Miranda (ECF No. 19)

In his next motion, Cuba argues that any statement he made after he was arrested should be suppressed because he did not waive his right to remain silent after Trooper Maples recited his Miranda rights. (ECF No. 19). Specifically, he aims to suppress the statement, "It's Flint," in response to Trooper Maples' observation that Cuba had a gun. The government does not address waiver but instead argues that because Cuba did not unequivocally invoke his right to remain silent, troopers were not required to end the interrogation. (ECF No. 21).

Under Miranda v. Arizona, 384 U.S. 436, 467 (1966), "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." The "failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." Missouri v. Seibert, 542 U.S. 600, 608 (2004). A waiver of rights "must be made 'voluntarily, knowingly and intelligently." United States v. Williams, 998 F.3d 716, 736 (6th Cir. 2021)

(quoting Miranda, 384 U.S. at 444). This requires that the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it," Moran v. Burbine, 475 U.S. 412, 421 (1986), and that it was not the product of coercion, Williams, 998 F.3d at 737. This analysis looks at the totality of the circumstances, Williams, 998 F.3d at 737, but does not require a waiver to be express, Berghuis v. Thompkins, 560 U.S. 370, 384 (2010). "An 'implicit waiver' of the 'right to remain silent' is sufficient to admit a suspect's statement into evidence." Berghuis, 560 U.S. at 384. Once the warnings have been given and a valid waiver has been obtained, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473-474. Invocation of this right must be unambiguous and unequivocal to prevent officers from further questioning. Berghuis, 560 U.S. at 382.

Although the government is correct that Cuba did not unambiguously and unequivocally invoke his right to remain silent, "[e]ven absent the accused's invocation of the right to remain silent, the accused's statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused 'in fact knowingly and voluntarily waived

Miranda rights' when making the statement." Berghuis, 560 U.S. at 382 (citing North Carolina v. Butler, 441 U.S. 369, 373 (1979)). Here, Trooper Maples and Cuba were having a conversation, at which time Trooper Maples stopped to read Cuba his Miranda rights. He then proceeded to ask Cuba twice if he understood those rights, and Cuba did not respond, despite responding to Trooper Maples' statements immediately prior to the reading of his rights. When Trooper Maples asked Cuba if he could hear him, Cuba's responses were unintelligible. Ultimately, Trooper Maples said, "You don't want to talk?" and Cuba responded, "There's nothing to talk about."

A waiver can be inferred "from the actions and words of the person interrogated," Butler, 441 U.S. at 373, and police are "not required to obtain a waiver of [the] right to remain silent before" an interrogation, Berghuis, 560 U.S. at 389. Instead, "[t]he Miranda rule and its requirements are met if a suspect receives adequate Miranda warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." Berghuis, 560 U.S. at 378. A waiver can therefore "be implied through 'the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver.'" Id. at 384 (quoting Butler, 441 U.S. at 373).

Based on the conversation that occurred, Trooper Maples read Cuba his Miranda rights, verified that Cuba could hear him but was choosing not to respond, and Cuba had the opportunity to invoke his rights at any time during the conversation. This is sufficient to show that Cuba received and understood his Miranda rights, including the right to remain silent. Any voluntary statement made thereafter was then sufficient to waive his rights. See Berghuis, 560 U.S. at 388-389 ("[A] suspect who has received and understood the Miranda warnings, and has not invoked his Miranda rights, waives the right to remain silent by making an uncoerced statement to the police."). Although Cuba asks the Court to suppress the statement, "It's Flint," he does not argue that the statement was involuntary, nor does he assert that he did not understand his rights as read to him. Instead, he appears to argue that Trooper Maples was required to obtain an express waiver before continuing the interrogation: an argument that has been foreclosed by the Supreme Court. See Berghuis, 560 U.S. at 389 ("The police, moreover, were not required to obtain a waiver of Thompkins' right to remain silent before interrogating him."). And as discussed above, Cuba's statement, "There's nothing to talk about," was also insufficient to invoke his right to remain silent and cease all interrogation. See Mack v. Jones, 540 F.

Supp. 2d 840, 850 (E.D. Mich. 2008) ("I really got nothing to say" did not constitute a clear and unequivocal invocation of the right to remain silent); United States v. Keels, 680 F.Supp.3d 841, 845-46 (E.D. Mich. 2023) (same, regarding the statement "I don't want to say nothing").

For these reasons, Cuba's motion to suppress his statement is denied.

## V. CONCLUSION

For the reasons set forth above, Defendant's motions to suppress (ECF Nos. 18, 19) are DENIED.

SO ORDERED.

Date: October 26, 2026

s/F. Kay Behm
F. Kay Behm
United States District Judge